UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>$100,000 IN UNITED STATES CURRENCY SEIZED FROM VERNETTA CASADY, et al.,<br><br>    Defendants. | Case No. 14-cv-00513-JSC<br><br>**ORDER GRANTING MOTION FOR DEFAULT JUDGMENT**<br><br>Re: Dkt. No. 18 |

This is a judicial forfeiture action brought under 21 U.S.C. § 881(a)(6) involving the seizure of Defendant $100,000 in United States currency seized from Vernetta Casady ("Defendant $100,000 (VC)") and Defendant $100,000 in United States currency seized from Michael Tucci ("Defendant $100,000 (MT)"). The clerk has entered default, and the United States now brings a Motion for Default Judgment ("Motion"). A hearing on the Motion was held on July 31, 2014 at 9:00 a.m. and no party appeared to make a claim on either defendant sum. For the reasons stated below, and good cause appearing, the Motion is GRANTED.[1]

## BACKGROUND

**A. Factual Allegations**

On June 13, 2013, at approximately 10:15 a.m., agents from the Drug Enforcement Administration ("DEA") initiated surveillance at the San Francisco International Airport ("SFO"), in the area of Gate No. 40, anticipating the arrival of Delta Airlines Flight #745. (Dkt.

---

[1] The United States has consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. § 686(c). *See* Dkt. No. 10. No other party appeared. In an *in rem* forfeiture proceeding, a party that fails to comply with the applicable filing requirements is precluded from standing as a "party" to the action, making it unnecessary to obtain the individual's consent to proceed before a magistrate judge. *United States v. 5145 N. Golden State Blvd.*, 135 F.3d 1312, 1317 (9th Cir. 1998). Therefore, the undersigned magistrate judge may enter judgment in this case.

No. 1 ¶ 9.) The DEA agents observed Vernetta Casady whose description matched that of woman who was taking Flight #745 from Detroit to SFO. (Dkt. No. 1 ¶ 9.) During a routine security screening at Detroit Metropolitan Airport, Transportation Security Administration ("TSA") officers identified the woman whose description matched Casady's as having a large sum of money which the she claimed totaled $60,000. (*Id*.) At approximately 10:30 a.m., Casady was observed exiting Delta Flight #745 with a male passenger, later identified as Michael Tucci. (*Id*.)

Two DEA agents approached Casady to conduct a consensual encounter. (*Id*. at ¶ 10.) The agents explained to Casady that she was not under arrest and was free to leave at any time, which she appeared to understand. (*Id*.) At the same time, agents approached Tucci from the other side to conduct a consensual encounter explaining that he was not under arrest and he was free to leave at any time. (*Id*.)

### 1. Money seized from search of Vernetta Casady

Upon the agent's request, Casady identified herself to the agents using her Michigan Identification card. (*Id*. ¶ 11.) She told the agents she was visiting San Francisco on vacation and that she planned to return to Michigan six days later, but she was unable to provide proof of a return flight. (*Id*.) During the encounter, Casady's answers to questions regarding her travel were evasive, she appeared overly nervous, and her face reddened. (*Id*.) Casady appeared to attempt to control the conversation by repeatedly asking why the agents wanted to speak to her, but did not try to leave the area and continued speaking with the agents and remained in conversation with them. (*Id*.) One of the DEA agents asked Casady if she was carrying any United States currency; she admitted that she was and said that she did not think it was illegal to do so. (*Id*. ¶ 12.) The agents told her that it was not if the currency was being carried for a legitimate reason, which was what the agents were attempting to determine. (*Id*.) Casady told the agents that she had $60,000 with her, but stated that she did not want them to search her carry-on luggage. (*Id*.) Casady stated that the money was so she could "have a good time" on her trip and go shopping while in wine country; however, she could not confirm where she was staying in wine country or whether she had reserved any lodging. (*Id*.)

When asked where she obtained such a large amount of cash, Casady said it was money

1  she had saved which she keeps in her residence. (*Id.* ¶ 14.) She claimed that she owned a parking
2  lot maintenance business, but was unable to provide any proof of the businesses existence such as
3  business cards, a website, or email address. (*Id.* ¶ 15.) Casady indicated that the company made
4  about $100,000 gross income in 2012. (*Id.*) She provided a business card for a company called
5  Nu Skin for which she worked as an "Independent Distributor." (*Id.* ¶ 16.)

6      One of the agents again asked for Casady's consent to search her bags and she stated that
7  she did not know why they needed to see the money. (*Id.* ¶ 17.) The agent told her that he
8  suspected that she brought the large amount of currency to California to buy drugs or that the
9  money was the proceeds of drug transactions. (*Id.*) Casady denied that this was the case, but she
10 could not provide logical answers regarding where she got the money or what she intended to do
11 with it. (*Id.*) The agent explained that without her consent to search the bags, the agents would
12 have to seize her bags and apply for a search warrant which would take a day or two. (*Id.* ¶ 18.)
13 Casady then consented to the search. (*Id.*)  The agent explained that she did not have to consent
14 to the search, that she had the right to refuse the search and that any consent she provided would
15 be voluntary and done on her own without any influence from the agents. (*Id.*) Casady said she
16 understood and was willing to consent to the search. (*Id.*)

17     The DEA agents searched her rolling carry-on and found numerous rubber-banded
18 bundles of currency. (*Id.* ¶ 19.) The agent asked her if she had more money in her purse and
19 Casady stated that she did not, but admitted that she did after the agent asked if he could search
20 her purse. (*Id.*) Casady told the agents the total amount of currency was $100,000, and when
21 asked why she initially told them she had only $60,000, she said that she was only answering as to
22 the money found by the TSA officers during the security check at the Detroit airport. (*Id.*) The
23 total amount of currency was $100,000 which is now a defendant in this case. (*Id.*) The
24 $100,000 consisted of 2700 bills and was in the following denominations: $100 x 500, $50 x 200,
25 $20 x 2000. (*Id.*)

26     One of the DEA agents asked Casady about her connection to Tucci, and Casady indicated
27 that he was an old friend from Michigan whom she happened to meet on the plane by coincidence.
28 (*Id.* ¶ 20.) The DEA agent told Casady that Tucci was carrying a large sum of money as well and

asked her if she knew why; she indicated that she did not as she only happened to run into him on the plane. (*Id*.) The DEA agent told her that it seemed unlikely that two people claiming to be friends would happen to run into each other on a plane and both be travelling with a large sum of cash. (*Id*.) Casady had no response. (*Id*.) The agent then told Casady that the money was going to be seized based on the totality of the circumstances on the basis that it was money brought to California with the intent to purchase illegal drugs or that it was the proceeds of illegal drug transactions. (*Id*. ¶ 21.) Casady denied that the money was for drugs, but did not offer any other explanation. (*Id*.)

The $100,000 was placed in a self-sealing DEA evidence bag and placed behind a ticket kiosk. (*Id*. ¶ 23.) Logan, a narcotics detection canine, was brought to the location to conduct a search; he located the bag and sat staring at it which was an indication that the odor of illegal drugs was emanating from the currency inside the evidence bag. (*Id*.) Logan is certified to detect heroin, cocaine, marijuana, and methamphetamine. (*Id*. ¶ 24.) The DEA agent working with him has handled and trained him since October 2012. (*Id*.) Logan has successfully located drugs over 150 times in connection with training and deployment. (*Id*.)

The DEA evidence bag was then taken to the SFO Bank of America and converted into a cashier's check for $100,000 made payable to the United States Marshal's Service (cashier's check #003196136).

**2. Money seized from search of Michael Tucci**

Two other DEA agents consensually interviewed Tucci at the same time Casady was being interviewed. (*Id*. ¶ 26.) Tucci told the agents that he came to visit some friends in San Francisco and to play poker at the Bay 101 Poker Club. (*Id*. ¶ 27.) The agents noticed that Tucci began to sweat profusely as he was speaking such that sweat ran down his forehead into his eyes. (*Id*.) When the agents asked him about his sweating, Tucci stated that he had the flu. (*Id*.) Tucci provided his Michigan driver's license as his identification. (*Id*.) One of the agents asked Tucci if he had ever been arrested. (*Id*.) Although he initially stated that he had not, he later admitted that he had been arrested in Oklahoma for possession of marijuana and that at the time of his arrest he had $15,000 in cash seized. (*Id*.) Tucci indicated that he had purchased a return plane ticket for

4

1  Sunday, July 16th.  Tucci stated that Casady was a family friend.  (*Id*.)  When he was asked if he
2  was staying with her in San Francisco, he stated "No, I'm gonna visit friends and play poker and
3  she is gonna do her thing."  (*Id*.)  Tucci advised that he did not have reservations to stay anywhere
4  in San Francisco.  (*Id*.)

5  When one of the DEA agents asked Tucci if he was currently in possession of any
6  illegal narcotics, he said "No, but I have some money."  (*Id*. ¶ 28.)  Tucci told the agents that he
7  had "Over $100,000" because he plays high stakes poker tournaments.  (*Id*.)  The agents asked
8  Tucci if they could search his bags and he said yes.  (*Id*.)  During the search of his suitcase, the
9  agent observed three large bundles of United States currency and numerous other rubber-banded
10 bundles of currency during the search of his computer bag. (*Id*.)

11 Tucci told the agents that he owns a construction company, Great Lakes Gunite and
12 Construction in Sterling Heights, Michigan, which had $1.4 million in sales last year.  (*Id*.)  The
13 agents asked Tucci if he had withdrawn the money from a bank and he said "No, I had it in a
14 safe."  (*Id*.)  The agents later confirmed that there was a business matching this name in Sterling
15 Heights Michigan and nearby Royal Oaks, Michigan.  (*Id*. ¶ 29.)  Websites listed the estimated
16 "annual revenue" for the business as between $120,000 and $170,000.  (*Id*.)

17 The agents advised Tucci that the currency he was carrying was going to be seized as
18 suspected drug proceeds pending further investigation.  (*Id*. ¶ 30.)  The agents seized $100,000
19 from Tucci, which is now a Defendant in this case.  The $100,000 consisted of a total of 1500 bills
20 in the following denominations:  $100 x 650, $50 x 400; and $20 x 750. (*Id*. ¶ 28.)  The money
21 was placed in a self-sealing, DEA evidence bag and sealed.  (*Id*. ¶ 30.)

22 The agents then placed the bag containing the currency next to a garbage can near the
23 United Airlines baggage carousel.  (*Id*. ¶ 31.)  Mannix, a certified narcotics detection canine, was
24 then brought to the area to conduct a systemic search.  (*Id*.)  Mannix located the bag and stood and
25 stared at it which was an indication that the odor of narcotics was emanating from the currency
26 inside the bag.  (*Id*.)  Mannix is certified to detect heroin, cocaine, marijuana, and
27 methamphetamine.  (*Id*.  ¶ 31.)  The DEA agent working with Mannix has handled and trained
28 him since January 2010.  (*Id*.)  Mannix has successfully located illegal narcotics over 300 times in

1  connection with training and deployment.  (*Id.*)

2  The DEA evidence bag was then taken to the SFO Bank of America and converted into a
3  cashier's check for $100,000 made payable to the United States Marshal's Service (cashier's
4  check #003196137).

5  **B. Claim for Relief**

6  The United States filed this action under 21 U.S.C. § 881(a)(6), which provides, in relevant
7  part, that property "subject to forfeiture" includes "[a]ll moneys ... intended to be furnished by any
8  person in exchange for a controlled substance or listed chemical in violation of this subchapter."
9  21 U.S.C. § 881(a)(6).  The United States alleges that the following factors support a totality of the
10  circumstances showing that Defendants $200,000 is involved in drug trafficking and is therefore
11  subject to forfeiture:

12  (1) Casady and Tucci, who knew each other, claim to have coincidentally traveled to San
13  Francisco on the same flight from Detroit each carrying $100,000 in United States Currency,
14  which is a substantial amount of cash;

15  (2) their demeanor during the consensual encounter – Casady was so nervous
16  her face noticeably reddened and Tucci perspired so much that beads of perspiration ran into his
17  eyes;

18  (3) their manner of responding to the agents' questions;

19  (4) their inability to explain where they were staying or provide a credible story of why
20  they each had such substantial amounts of currency;

21  (5) Casady lied to the to the agents initially stating that she had $60,000 in United States
22  Currency when she actually had $100,000 in United States Currency;

23  (6) Tucci initially lied to the agents about being arrested and then later admitted he had
24  been arrested for possession of a controlled substance at which time he had $15,000 seized from
25  him;

26  (7) they each carried bills predominantly in denominations of $20– Casady carried 2000
27  $20 bills and Tucci had 750 $20 bills, which is a common denomination used in street drug
28  transactions;

1  (8) San Francisco is a known source city for the purchase of illegal controlled substances;

2  (9) drug traffickers have to transport large amounts of currency to source cities to pay for
3  their illegal inventories; and

4  (10) people who are not involved in drug trafficking do not travel with such large amounts
5  of currency because more secure, inexpensive methods of transferring cash are available.
6  (Dkt. No. 1 ¶ 34.)

### C. Procedural History and Notice

The United States filed this action on February 3, 2014.  On February 4, 2014, the United States gave notice of this action directly to Casady and Tucci by serving a copy of the Complaint for Forfeiture, the Notice of Forfeiture Action, the Warrant of Arrest of Property In Rem, and related documents, via certified U.S. mail to Casady and Tucci's last known addresses as well as to Gail Shifman, who is apparently their attorney.  (Dkt. Nos. 5 & 8.).  The United States also published notice of this forfeiture action on an official government website (www.forfeiture.gov) for at least 30 consecutive days, beginning on February 5, 2014. (Dkt. No. 12.)

While Casady and Tucci filed administrative claims asserting their entitlement to Defendant $100,000 (VC) and Defendant $100,000 (MT), neither filed a verified claim as required in this forfeiture action.  Indeed, no one appeared to file a verified claim to Defendant $100,000 (VC) or Defendant $100,000 (MT), or has otherwise responded to this action.  On April 8, 2014, the government filed a motion for entry of default which was served by first class U.S. mail on Casady's and Tucci's last known addresses as well as to their attorney, Gail Shifman.  (Dkt. No. 14.)  Following the clerk's entry of default, the government again served Casady and Tucci and their attorney in the same manner with the notice of default.  (Dkt. No. 16.).  On June 16, 2014, the government filed its motion for default judgment and served Casady and Tucci again in the same manner.  (Dkt. Nos. 18-22.)  The court held a hearing on July 31, 2014, and no one appeared to contest the government's motion.

## DISCUSSION

### I.  Jurisdiction

The court has jurisdiction over this matter under 28 U.S.C. §§ 1345 and 1355(a), which

7

vests district courts with original jurisdiction in "any action or proceeding for the ... enforcement of any ... forfeiture ... incurred under any Act of Congress." *See* 28 U.S.C. § 1355(a).

## II. Legal Standard

### A. Forfeiture

Forfeiture is "harsh and oppressive" and thus, is "not favored by the courts." *See U.S. v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1069 (9th Cir. 1994). The Ninth Circuit is "particularly wary of civil forfeiture statutes" because they "impose 'quasi-criminal' penalties" but do not provide property owners with the degree of procedural protections provided to criminal defendants. *See id*. at 1068; *U.S. v. Marlof*, 173 F.3d 1213, 1217 (9th Cir. 1999). Accordingly, strict adherence to procedural rules is paramount in civil forfeiture proceedings. *See Marlof*, 173 F.3d at 1217 (denying forfeiture where government "erred" by failing to provide due notice to property owner); *$191,910.00 in U.S. Currency*, 16 F.3d at 1068–69 (strictly construing currency forfeiture provisions of 19 U.S.C. § 615 against government and holding that "the burden on the government to adhere to procedural rules should be heavier than on claimants").

### B. Default Judgment

After entry of default, a court may grant default judgment on the merits of the case. *See* Fed. R. Civ. P. 55. The factual allegations of the complaint, except those concerning damages, are deemed to have been admitted by the non-responding party. *Geddes v. United Fin. Grp*., 559 F.2d 557, 560 (9th Cir. 1977). "The district court's decision whether to enter a default judgment is a discretionary one." *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). A court should consider the following factors in determining whether to enter default judgment:

> (1) the possibility of prejudice to the plaintiff, (2) the merits of plaintiff's substantive claim, (3) the sufficiency of the complaint, (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect, and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986).

### III. Default Judgment is Warranted

The Clerk entered default on April 14, 2014. (Dkt. No. 15.) Thus, the factual allegations

1  of the Government's Complaint are deemed true and the Court is vested with the authority to enter
2  default judgment. The decision whether to exercise its discretion to do so is guided by two
3  overlapping inquiries: (1) the government's claims in light of the factors set forth by the Ninth
4  Circuit in *Eitel*, 782 F.2d at 1471–72; and (2) whether the government has met the specific
5  procedural requirements governing forfeiture actions.

### A. Eitel Factors

The majority of the *Eitel* factors support default judgment. First, if the Motion were to be denied, then the government would likely be left without a remedy. *See Pepsico, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002). The second and third factors also support granting default judgment, as the United States' allegations, assumed to be true, show that the defendant funds are subject to forfeiture under 18 U.S.C. § 881(a)(6) as the most plausible inference from those facts is that the funds were related to drug trafficking. The sum of money at stake ($200,000), though substantial, is not so large as to warrant denial of the Motion. As discussed further below, Casady, Tucci, and their attorney were properly served with the Complaint, Arrest Warrant and Notice of Forfeiture Action, thus there is no indication of a possibility of dispute concerning material facts or that the default was due to excusable neglect. Finally, although the seventh *Eitel* factor, which favors decisions on their merits, weighs against default judgment, no party has filed a verified claim for the defendant funds, and thus deciding the case on the merits is not possible. Accordingly, the *Eitel* factors as a whole weigh in favor of granting the Motion.

### B. Compliance with Forfeiture Procedures

The Supplemental Rules for Certain Admiralty and Maritime Claims ("Supplemental Rules") govern judicial forfeitures of property. *United States v. 5145 N. Golden State Blvd.*, 135 F.3d 1312, 1315 (9th Cir. 1998). Under Admiralty and Maritime Local Rule 6–1(a) for the Northern District of California, "[a] party seeking a default judgment in an action *in rem* must show that due notice of the action and arrest of the property has been given ... [t]hrough execution of process in accordance with Fed. R. Civ. P. Supp. G(3); and ... in accordance with Fed. R. Civ. P. Supp. G(4)." Admir. L.R. 6–1(a).

**1)** *Supplemental Rule G(3)*

Supplemental Rule G(3) governs judicial authorization and process. Supplemental Rule G(3) provides that "the clerk must issue a warrant to arrest the property if it is in the government's possession, custody, or control." Fed. R. Civ. P. Supp. G(3)(b)(i). In this case, a Warrant of Arrest of Property In Rem was issued on February 4, 2014. (Dkt. No. 7.)

Supplemental Rule G(3) also states that "[t]he warrant and any supplemental process must be delivered to a person or organization authorized to execute it," including "someone under contract with the United States." The certificates of service state that Carolyn Jusay, a paralegal in the Asset Forfeiture Unit of the United States Attorney for the Northern District of California, served the relevant documents in this case via United States certified mail delivery upon the last known addresses of Casady, Tucci, and their attorney, Gail Shifman. *See* Dkt. Nos. 5 & 8. Based on the foregoing, service was in compliance with Supplemental Rule G(3).

**2)** *Supplemental Rule G(4)*

Supplemental Rule G(4) requires both notice by publication and notice to known potential claimants. *See* Fed. R. Civ. P. Supp. G(4)(a)-(b). First, with respect to notice by publication, Rule G(4)(a) provides that "[a] judgment of forfeiture may be entered only if the government has published notice of the action within a reasonable time after filing the complaint or at a time the court orders," and requires that a published notice: "(A) describe the property with reasonable particularity; (B) state the times under Rule G(5) to file a claim and to answer; and (C) name the government attorney to be served with the claim and answer." Fed. R. Civ. P. G(4)(a)(i)-(ii). Rule G(4) further provides the notice may be published by "posting a notice on an official internet government forfeiture site for at least 30 consecutive days." Fed. R. Civ. P. Supp. G(4)(a)(iv).

To demonstrate compliance with the published notice requirement, the United States has filed a "Declaration of Publication," which states that the United States published notice of the action on an official government website (www.forfeiture.gov), where it remained for at least 30 consecutive days beginning April 10, 2013. (Dkt. No. 12.) The published notice described the property to be seized as "$100,000.00 U.S. Currency (13-DEA-584580) which was seized from Michael Tucci on June 13, 2013 at San Francisco International Airport, located in San Francisco,

1  CA $100,000.00 U.S. Currency (13-DEA-584655) which was seized from Vernetta Elizabeth
2  Casady on June 13, 2013 at San Francisco International Airport, located in San Francisco, CA."
3  *Id*. The published notice also noted that "[a]ny person claiming a legal interest in the Defendant
4  Property must file a verified Claim with the court within 60 days from the first day of publication
5  (February 05, 2014)" and named Assistant United States Attorney Patricia Kenney as the
6  government attorney to be served. This notice complies with the requirements of Supplemental
7  Rule G(4)(a).

8  Next, with respect to notice to known potential claimants, Rule (G)(4)(b) requires the
9  government to "send notice of the action and a copy of the complaint to any person who
10 reasonably appears to be a potential claimant." Fed. R. Civ. P. Supp. G(4)(b)(i). The notice must
11 state "(A) the date when the notice is sent; (B) a deadline for filing a claim, at least 35 days after
12 the notice is sent; (C) that an answer or a motion under Rule 12 must be filed no later than 21 days
13 after filing the claim; and (D) the name of the government attorney to be served with the claim and
14 answer." *Id*. at G(4)(b)(ii).

15 The Notice of Forfeiture was served on Casady and Tucci, as well as their attorney Gail
16 Shifman, with the Complaint and Arrest Warrant. The Notice of Forfeiture: (A) is dated February
17 3, 2014 and was served on February 4, 2014; (B) states that the deadline for filing a claim is at
18 least 35 days after the notice is sent; (C) states that an answer to the complaint or a motion under
19 Rule 12 of the Federal Rules of Civil Procedure must be filed within 21 days after filing a claim;
20 and (D) identifies Assistant United States Attorney Patricia J. Kenney as the government attorney
21 to be served. Therefore, the United States has demonstrated compliance with the requirements of
22 Supplemental Rule G(4)(b).

23 Accordingly, notice by publication and notice to known claimants complies with
24 Supplemental Rule G(4).

25 For the reasons stated above, the United States' Motion for Default Judgment is
26 GRANTED.

27 **IT IS SO ORDERED.**

28 Dated: July 31, 2014

*Jacqueline S. Corley*
JACQUELINE SCOTT CORLEY
United States Magistrate Judge